UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 75791 / August 28, 2015

ADMINISTRATIVE PROCEEDING
File No. 3-16317

In the Matter of

MYRIAD INTERACTIVE MEDIA, INC.

OPINION OF THE COMMISSION

SECTION 12(k) PROCEEDING

**Suspension of Trading**

Issuer seeks to terminate a trading suspension that was ordered after questions arose regarding the accuracy and adequacy of publicly disseminated information, including with respect to the relationship between the company's business prospects and the Ebola crisis, and possible market manipulation. *Held*, petition to terminate the trading suspension is denied because the Commission remains of the opinion that the public interest and the protection of investors required the trading suspension.

APPEARANCES:

*Adam S. Tracy*, of Securities Compliance Group, Ltd., for Myriad Interactive Media, Inc.

*Deena R. Bernstein*, *Amy Gwiazda*, and *Lauchlan Wash*, for the Division of Enforcement.

Petition for termination filed: December 1, 2014
Last brief received: February 12, 2015

On November 20, 2014, we issued an order temporarily suspending trading in the securities of Myriad Interactive Media, Inc. (MYRY) pursuant to Section 12(k)(1) of the Securities Exchange Act of 1934 (the "Trading Suspension Order").[1] The Trading Suspension Order stated that "[q]uestions have arisen concerning the accuracy and adequacy of publicly disseminated information," including information about the relationship between Myriad's "business prospects and the current Ebola crisis."[2] It further stated that the "Commission is of the opinion that the public interest and the protection of investors require the suspension of trading" for a period of ten business days.[3] Myriad submitted a timely petition to terminate the trading suspension pursuant to Rule of Practice 550.[4] Because we remain of the opinion that the public interest and the protection of investors required suspension of trading in Myriad's securities, we deny the petition.

## I. BACKGROUND

Our recent opinion in *Bravo Enterprises* described the legal framework governing the Commission's trading-suspension authority under Section 12(k)(1) and our practice with respect to the disposition of Rule 550 petitions.[5] We briefly summarize that discussion here.

Exchange Act Section 12(k)(1) provides that "[i]f in its opinion the public interest and the protection of investors so require, the Commission is authorized by order . . . summarily to suspend trading in any security . . . for a period not exceeding 10 business days."[6] The text, structure, and legislative history of this provision show that Congress conferred upon us broad discretion in determining when to temporarily suspend trading in a security.[7] The relevant inquiry is whether we are of the "opinion" that a trading suspension is required in light of "public interest" and "protection of investors" considerations. We explained in *Bravo Enterprises* that the Commission may suspend trading without determining that an issuer has violated the securities laws; in particular, we are not required to find that an issuer failed to comply with periodic reporting requirements, committed an antifraud violation, or otherwise engaged in

---

1 15 U.S.C. § 78*l*(k)(1); *Bravo Enters. Ltd.*, Securities Exchange Act Release No. 73650, 2014 WL 6480286 (Nov. 20, 2014) (press release announcing suspension of trading in securities of four issuers); *Bravo Enters. Ltd.*, 2014 WL 6480308 (Nov. 20, 2014) (Trading Suspension Order).

2 *Bravo Enters. Ltd.*, 2014 WL 6480308, at *1.

3 *Id*.

4 17 C.F.R. § 201.550.

5 *Bravo Enters.*, Exchange Act Release No. 75775, 2015 WL 5047983, at *2-5 (Aug. 27, 2015).

6 15 U.S.C. § 78*l*(k)(1).

7 *Bravo Enters.*, 2015 WL 5047983, at *2-4.

deceptive or manipulative conduct.[8] Section 12(k)(1) gives us the flexibility to take decisive steps when necessary to protect investors and the public interest. Discharging this function will at times require that we act before there has been an opportunity to fully develop information about a situation or while an investigation is ongoing.[9]

Section 12(k)(1)'s trading-suspension authority is an important tool for alerting the public about our concerns about an issuer, protecting investors against unfair or disorderly markets, and increasing the availability of information in the marketplace. Consequently, we have found it necessary to suspend trading in a variety of circumstances, which we discussed in *Bravo Enterprises*.[10] For example, we have suspended trading to protect the public interest and investors when there was a lack of current, adequate, and accurate information about an issuer; when an issuer did not file required periodic reports with the Commission; when we had concerns about the accuracy of publicly available information about the company; and when we had concerns about potential market manipulation or other unusual market activity occurring.[11] The trading suspension issued by the Commission in this case implicates several of these concerns.

## II. ANALYSIS

### A. The Commission will decide the merits of *Myriad's* timely Rule 550 petition.

We will consider Myriad's challenge to the Trading Suspension Order because it timely sought to terminate the suspension pursuant to Rule of Practice 550.[12] By way of procedural background, following issuance of the Trading Suspension Order, staff of the Division of Enforcement (the "Division") conveyed to Myriad's counsel the bases of the trading suspension. Myriad timely filed a Rule 550 petition prior to the expiration of the suspension. We then directed the Division to file all of the non-privileged factual information that was before the Commission at the time the Trading Suspension Order was issued.[13] We also directed the parties to make additional submissions, which they have done.[14] Although the trading suspension is no

---

8 *Id.* at *3.

9 *Id.* at *3-4.

10 *Id.* at *3 & nn.14-18, *5 & nn.30-32, 39-41.

11 *Id.* at *5 nn.30-32.

12 The Division does not dispute that Myriad is "adversely affected" by the trading suspension within the meaning of Rule 550.

13 *Myriad Interactive Media, Inc.*, Exchange Act Release No. 73897, 2014 WL 7243174, at *1 (Dec. 19, 2014).

14 We have determined to resolve the petition without scheduling an in-person hearing. *See* Rule of Practice 550(b), 17 C.F.R. § 201.550(b) (stating that the Commission may schedule a hearing "in its discretion"). No party has requested a hearing and we do not believe holding one would significantly aid our decisional process. *Bravo Enters.*, 2015 WL 5047983, at *6 & n.51.

longer in effect, we have the authority to resolve Myriad's petition on the merits.[15] Among other things, our decision to address the substance of Myriad's arguments promotes the development of the record in the event it seeks judicial review.

### B. The information before the Commission at the time of the Trading Suspension Order's issuance provided grounds for our opinion that the public interest and the protection of investors required a trading suspension.

When we issued the Trading Suspension Order, we reviewed the information before us and were of the "opinion that the public interest and the protection of investors require[d] the suspension of trading" in Myriad's securities given that "[q]uestions ha[d] arisen concerning the accuracy and adequacy of publicly disseminated information, including information about the relationship between the company's business prospects and the current Ebola crisis."[16]

Myriad is a Delaware corporation purportedly engaged in the business of developing websites and mobile applications. The company, which was originally incorporated in Nevada in 1990 as Investor Club of the United States, has operated under seven different corporate names, including Planet411.com, Inc., Ivany Mining Inc., and Ivany Nguyen Inc., and has announced a number of different business plans. In the past year alone, Myriad stated that it was involved in the Bitcoin "world" and the marijuana "sector" and formed a "gaming division" to develop a mobile gaming application. Myriad currently describes its business as "focused on building in house applications and technologies that the company wholly owns and can drive revenue streams." The trading suspension arises out of Myriad's recent claim that it is developing an "Ebola tracking app."

Myriad's securities are registered with the Commission pursuant to Exchange Act Section 12(g).[17] As of October 31, 2014, Myriad's common stock was quoted on OTC Pink marketplace within OTC Link under the symbol "MYRY."[18] Myriad's Form 10-K filed on October 22, 2014, for the fiscal year ended June 30, 2014 ("2013-2014 Form 10-K"), stated that Myriad had an accumulated deficit of about $13 million since its inception, that it would not be "conducting any product research or development during the next 12 months," that any business development activities would be dependent on securing further funding, and that its auditors had substantial doubt that it would be able to continue as a going concern.

---

15 *Id.* at *6; *Accredited Business Consolidators Corp.*, Exchange Release No. 73420, 2014 WL 5386875, at *2 n.21 (Oct. 23, 2014).

16 *Bravo Enters.*, 2014 WL 6480308, at *1.

17 15 U.S.C. § 78*l*(g).

18 OTC Pink is one of three "tiered marketplaces" within OTC Link, which is operated by OTC Markets Group, Inc. OTC Pink "offers trading in a wide spectrum of equity securities through any broker," has no minimum disclosure or reporting requirements, and "is for all types of companies that are there by reasons of default, distress or design." *See generally Positron Corp.*, Exchange Act Release No. 74216, 2015 WL 470454, at *1 & n.1 (Feb. 5, 2015).

At the time we issued the Trading Suspension Order, our opinion that the public interest and the protection of investors required the suspension of trading was based on our consideration of the information summarized below.

**1. Claims regarding the funding and royalty arrangements between Myriad and Mouse, LLC in connection with the "Ebola tracking system"**

On October 15, 2014, Myriad issued a press release claiming it had signed a contract with a company called "Mouse, LLC" that would "fully fund" Myriad's development of a "new Ebola tracking system." The press release stated that Myriad would "earn 15% in royalties." These statements appeared to us to be inconsistent with the Mobile App Design Agreement attached to the 2013-2014 Form 10-K. That agreement provided for a one-time payment to Myriad of only $2,000 for website design work, contained no mention of continuing royalty payments, and continued only through October 20, 2014, at which point "all Work [was] expected to be completed to [Mouse's] satisfaction." Further, the agreement provided that ownership and copyright for the project would belong to Mouse, which was in tension with Myriad's professed business model of "building in house applications . . . that the company wholly owns."

**2. Claims regarding the development status of the "Ebola tracking system"**

On October 24, 2014, Myriad issued another press release announcing that it had completed design of the "Ebola tracking system" and that it was "now in development mode on the app." Given that the Mobile App Design Agreement covered only website design and that the 2013-2014 Form 10-K indicated that the company lacked funding to conduct any development activities over the next 12 months, there appeared to be inadequate and possibly conflicting information available to investors with respect to the status of the project.

**3. Nondisclosure of related-party nature of Mouse transaction**

Myriad's October 15 press release did not disclose that Alan Sosa, Myriad's largest shareholder at 13% ownership, was also Mouse's principal.

**4. Myriad's previous operating history and its association with a "toxic" microcap financier**

We also considered the issuer's apparent business model. Myriad's prior business plans suggest that the company capitalizes on subjects that have received significant media attention, a characteristic common to many penny stock touts.[19] In December 2013, Myriad announced purported business plans related to Bitcoin; before that, it had represented that it was involved in

[19] *Bravo Enters.*, 2015 WL 5047983, at *5 & n.38.

the "marijuana sector."[20] Additionally, Myriad's interest in the Bitcoin sector coincided with its association with Curt Kramer, a promoter of "toxic" microcap financing.[21] Myriad entered into several convertible promissory notes with Asher Enterprises, Inc., a company controlled by Kramer, the last of which was due in February 2014. In December 2013 and January 2014, Myriad's Bitcoin plans were actively promoted by two stock promotion entities called "Best Damn Pennies" and "Wall St. Cheat Sheet." Over that period, Asher sold about 25 million Myriad shares for proceeds of approximately $311,000.

**5. Suspicious spikes in share price and trading volume coincided with stock touting activity**

The Division received two FINRA referrals highlighting an increase in Myriad's stock price and selling activity during the December 2013/January 2014 Bitcoin-related promotional activity. In the three months before December 10, 2013 (the date of Myriad's first Bitcoin press release), its share price fluctuated between $0.002 and $0.012. Between December 10, 2013 and January 15, 2014, its price fluctuated between $0.04 and $0.68—*i.e.*, at times more than a hundred-fold jump.

Similarly anomalous spikes in price and volume accompanied Myriad's October 15, 2014 press release touting its Ebola tracking app. For the three months before October 15, its daily trading volume never exceeded 1.3 million shares. On October 15, Myriad's trading volume increased to over 16 million shares and it closed at $0.009. After October 15, Myriad's share price fell, closing at $0.003 per share on October 22.

---

[20] Virtual currencies such as Bitcoin and marijuana-related businesses have been the subject of Investor Alerts issued by the Commission's Office of Investor Education and Advocacy. Securities and Exchange Commission, Office of Investor Education and Advocacy, *Investor Alert: Marijuana-Related Investments* (May 16, 2014), *available at* http://investor.gov/news-alerts/investor-alerts/investor-alert-marijuana-related-investments (last visited August 28, 2015); Securities and Exchange Commission, Office of Investor Education and Advocacy, *Investor Alert: Bitcoin and Other Virtual Currency-Related Investments* (May 7, 2014), *available at* http://investor.gov/news-alerts/investor-alerts/investor-alert-bitcoin-other-virtual-currency-related-investments (last visited August 28, 2015).

[21] "Toxic" funding refers to capital provided on extremely onerous terms, such as high-interest rates or the right to convert the amount due into stock at deep discounts. Kramer, the promoter with whom Myriad had dealings, entered into a $1.3 million settlement with the Commission in November 2013 for violating the federal securities laws in connection with the purchase of billions of shares in a pair of microcap companies and failing to register the shares before they were resold. *See Curt Kramer*, Securities Act Release No. 9485 (Nov. 25, 2013). For present purposes, the Commission has considered only the fact of the settlement, not the findings contained therein.

**C. Myriad's Rule 550 petition does not establish an entitlement to relief.**

Myriad contends that the trading suspension was not in the public interest and was unnecessary for the protection of investors. Upon review of the information and arguments in the petition and briefs, we remain of the opinion that the public interest and the protection of investors required the suspension of trading pursuant to Section 12(k)(1) of the Exchange Act. We address Myriad's factual arguments before turning to its legal ones.

**1. Myriad's challenges to the factual basis of the trading suspension are without merit.**

Myriad argues that the trading suspension was unwarranted because its public statements were accurate and there is no evidence that they misled or confused investors. It also contends that we relied on irrelevant facts that cannot support a trading suspension, such as the company's previous operating history. We disagree.

*a) Claims regarding the funding and royalty arrangements between Myriad and Mouse, LLC in connection with the "Ebola tracking system"*

Myriad argues that its Ebola tracking system is a *bona fide*, legitimate business venture. It provides a number of documents that, according to Myriad, show that it entered into valid and enforceable agreements with Mouse, received payment, and designed and implemented a mobile application that displays new Ebola cases. These assertions are not responsive to the concerns underlying the Trading Suspension Order, and even assuming for the sake of argument that they were correct, our concerns regarding the adequacy and sufficiency of the company's disclosures about the funding and royalty arrangements between Myriad and Mouse would remain.[22]

For example, it is undisputed that the October 15 press release states that Myriad will earn 15% in royalties, yet the Mobile App Design Agreement attached to the 2013-2014 Form 10-K contains no royalty provision. Myriad attaches a *different* version of the agreement to its Rule 550 petition that is the same in all respects, except that it does contain a royalty provision. Myriad asserts that this later version is the "true and accurate copy of the contract," but it does not acknowledge the discrepancy or explain how it came about.[23] We need not definitively resolve these questions. At minimum, the continuing confusion regarding the existence of the

---

[22] Myriad also states that there is no evidence that it "sought to mislead or confuse the market." This is beside the point because the Commission has the authority under Section 12(k)(1) to suspend trading without a finding of scienter. *See Bravo Enters.*, 2015 WL 5047983, at *3-4, *9 n.57. Thus, regardless of Myriad's intent, the Commission's chief concern was and is whether the press releases are adequate and accurate.

[23] Previous counsel for Myriad blamed an unspecified "Edgar error," but could not explain how the EDGAR system would omit only a single paragraph within a larger filing.

royalty provision is compelling evidence that investors lacked (and, for that matter, still lack) information necessary to make an informed investment decision.

*b) Claims regarding the development status of the "Ebola tracking system"*

Myriad's October press releases claimed that the Ebola tracking app was "fully funded" and in "full speed" development mode. Myriad contends that these statements are consistent with the disclosure in its 2013-2014 Form 10-K—to the effect that the company did not have funding to pursue development activities over the next year—because it entered into agreements with Mouse to develop the application on October 6 and 28, after the close of the fiscal year for which the Form 10-K was filed. Myriad argues that the October agreements provided Myriad with cash infusions that were set aside specifically for developing the Ebola tracking system. We do not find these explanations to be satisfactory.

Assuming for the sake of discussion that the October agreements are valid, a close reading of the agreements shows that they do not support the representations in Myriad's press releases.[24] The October 6 agreement covered only "graphic design" services to be provided by Myriad and could not fairly be characterized as "fully fund[ing]" the application as whole. The October 28 agreement, which did cover coding and development, *postdated* Myriad's October 24 press release touting the application's "full speed" development.

Further, we reject Myriad's implicit assumption that its Form 10-K could ignore any event taking place after the fiscal year covered by the report. The instructions for that form direct that "[e]xcept where information is required to be given for the fiscal year or as of a specified date, it shall be given as of the latest practicable date." And Exchange Act Rule 12b-20 provides that "[i]n addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading."[25] The 2013-2014 Form 10-K's unqualified statements that Myriad was "dependent upon obtaining financing to pursue significant development of our various ongoing projects" (but did not "currently . . . have any firm arrangements for the required . . . financing") and that Myriad would "not be conducting any product research or development during the next 12

---

[24] Myriad also argues that the amounts it was due to be paid pursuant to the October agreements (totaling approximately $10,000) were so small that the agreements did not have to be separately disclosed. We reject this argument for two reasons. First, the Commission's concerns did not arise from a failure to disclose the agreements; rather, Myriad's October press releases contained affirmative representations that mischaracterized the content of those agreements. Second, the October agreements were material under the circumstances here. Indeed, Myriad concedes that it would have been unable to conduct any product-development activity without the funds provided by those agreements.

[25] 17 C.F.R. § 240.12b-20.

months" would be understood by a reasonable investor to be referring to the company's prospects at the time of the report's filing in mid-October.

We therefore remain of the opinion that there was conflicting information in the marketplace with respect to the status of the project and Myriad's ability to continue development, both at the time the press releases were issued and at the time that we issued the Trading Suspension Order.

*c) Nondisclosure of related-party nature of Mouse transaction*

Myriad identified Mouse's principal, Alan Sosa, as a holder of 13% of Myriad's common stock only in its 2013-2014 Form 10-K filed subsequent to the October 15 press release. Myriad claims that its failure to disclose this relationship in the press release itself did not have any potential to mislead because its October agreements with Mouse were *bona fide* and made at "arms-length."[26] We find this argument to be unpersuasive. Regardless of the fairness of the agreements' terms standing alone, a reasonable investor would consider important whether Myriad's purported mobile-application-development business model had attracted interest from customers *without a financial stake in Myriad itself*. Myriad's opening brief tacitly acknowledges the significance of this distinction. The brief emphasizes that Myriad was "contracted by a third party[] and paid by a third party[] to create a mobile application," whose subject matter (*i.e.*, Ebola) was "conceived by a third party." The related-party nature of the transaction is material to, among other others, an investor's ability to evaluate Myriad's sources of funding and revenue and its prospects for generating similar business going forward.[27]

*d) Myriad's previous operating history and its association with a "toxic" microcap financier*

Myriad does not dispute that it has changed business models several times to take advantage of media fads and to avoid scrutiny. Its December 2013 entry into the "Bitcoin arena" was accompanied by a press release stating that the "only topic that's possibly more popular than medical marijuana now is Bitcoin." And when Myriad decided in May 2014 to "terminate[] [its] medical marijuana mobile app," its press release explicitly cited the Commission's Investor Alert regarding marijuana-related investments and stated that the company did "not want to entangle [itself] within a sector facing so much negative scrutiny." Although Myriad contends that a company's previous operating history should not play a part in the Commission's decision whether to suspend trading, a bright-line rule excluding such information is inconsistent with the standard set forth in Exchange Act Section 12(k)(1) and that provision's purposes and objectives.

---

[26] Myriad also asserts that Sosa purchased his shares on the open market, but the manner of acquisition is immaterial to the fact that Sosa was Myriad's largest shareholder at the time the October agreements were entered into.

[27] *See, e.g.*, *In re China Valves Techs. Sec. Litig.*, 979 F. Supp. 2d 395, 407 (S.D.N.Y. 2013); *SEC v. Escala Group, Inc.*, No. 09 Civ. 2646(DLC), 2009 WL 2365548, at *10 (S.D.N.Y. July 31, 2009).

An issuer's history of touting involvement in areas that have recently captured public attention followed by anomalous spikes in trading is relevant, even if not dispositive, to our opinion whether a trading suspension is necessary in the public interest and for the protection of investors.

We also disagree with Myriad's view that its ties to Kramer and Asher Enterprises can have "no bearing" on our assessment of a trading suspension's propriety. Myriad admits it received a loan from a company controlled by a penny stock financier whose history it recognizes is "tattered." And although Myriad disclaims participation in the stock promotion campaign surrounding its Bitcoin-related activities, it recognizes that Asher liquidated its Myriad holdings while that campaign was ongoing.[28] We held in *Bravo Enterprises* that the "accuracy and adequacy of an issuer's disclosures about its officers or promoters, while generally not dispositive standing alone, can appropriately be taken into account by the Commission in forming the opinion that the public interest and the protection of investors make a trading suspension necessary."[29] We adhere to that position here.

*e) Suspicious spikes in share price and trading volume coinciding with stock touting activity*

Myriad asserts that the market's response to its press releases was not indicative of a pump-and-dump scheme because its disclosures were accurate, and instead reflected that the "Ebola virus presents an ongoing challenge" of interest to investors. Of course an increase in price and volume following the announcement of *truthful* and favorable information may not be a cause for concern.[30] But we disagree with the premise of Myriad's argument for the reasons stated above—namely, the October press releases made statements regarding Myriad's Ebola-related business prospects that, in our opinion, appeared to be misleading and incomplete.

Taken together, these concerns about the adequacy and accuracy of publicly available information regarding Myriad and other indicia of an ongoing, fraudulent stock-touting scheme support our determination that, in our opinion, the suspension of trading in Myriad's securities was necessary in the public interest and for the protection of investors.

**2. Myriad's legal arguments are without merit.**

We next address and reject Myriad's arguments that it has been singled out for unequal treatment and that the Commission should have been estopped from suspending trading.

---

28 Myriad's professed lack of knowledge about the stock touts does not detract from the fact that the touts occurred. Regardless of the culpable party, potential market manipulation implicates the Commission's interest in maintaining fair and orderly markets in which investors can make informed investment decisions. *Bravo Enters.*, 2015 WL 5047983, at *3 & n.16, *11.

29 *Id.* at *10.

30 *Immunotech Laboratories, Inc.*, Admin. Proc. File No. 3-16321, Exchange Act Release No. ____ at p. 10, 2015 WL ______ (Aug. 28, 2015).

*a) Myriad's selective-prosecution and equal-protection arguments fail.*

Myriad points out that many of the concerns that we identified as supporting the Trading Suspension Order apply equally to other securities as to which we have not suspended trading. For example, convertible loans are a "prevalent form[] of financing" for microcaps and Kramer and Asher Enterprises funded hundreds of other issuers listed on OTC Link. Similarly, changes in corporate control, name, and business model are not in themselves unusual. Myriad also asserts that "[m]edical cannabis and cryptocurrency related issuers litter the OTC Link landscape." In short, Myriad claims that we are "singling out" Myriad and enforcing the Exchange Act in an "unequal" fashion. Myriad's briefing does not make clear whether it intends to pursue a selective-prosecution or an equal-protection argument.[31] Either way, Myriad's claim is meritless.

To show selective prosecution, the defendant must be a member of a "protected class" and show both (1) that "prosecutors acted with bad intent" and (2) that "similarly situated individuals outside the protected category were not prosecuted."[32] This defense must be proven with "'clear evidence' sufficient to overcome the presumption of regularity" that attaches to enforcement decisions.[33] Here, Myriad has not alleged or provided clear evidence of any facts showing that it was unfairly singled out or that our decision to suspend trading was motivated by "improper considerations such as race, religion, or the desire to prevent the exercise of a constitutionally protected right."[34] There is no evidence that Myriad is in a protected class or that

---

[31] Although we assume for the sake of discussion in the text that selective-prosecution principles apply to our decision to suspend trading, we do not decide here whether those principles do, in fact, apply. Unlike an enforcement action to which those principles typically are applied, the Trading Suspension Order was not a determination to prosecute alleged violations or a finding that Myriad had violated any law. *See Bravo Enters.*, 2015 WL 5047983, at *3, *12 & n.70. A trading suspension is not punitive and we may suspend trading based on the conduct of unrelated third parties when that conduct threatens a fair and orderly marketplace. *See id.* at *3 n.16, *11; *Immunotech Laboratories, Inc.*, *supra* note 30, Exchange Act Release No. ____ at p. 10. But we need not pursue this issue further here, since Myriad has not demonstrated a basis for relief under the settled doctrine governing such claims.

[32] *Fog Cutter Capital Grp. Inc. v. SEC*, 474 F.3d 822, 826-27 (D.C. Cir. 2007) (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)); *see also Dolphin and Bradbury, Inc.*, Exchange Act Release No. 54143, 2006 WL 1976000, at *12 (July 13, 2006) (explaining that a "refusal to prosecute" is a "'decision committed to agency discretion'" and "a matter for prosecutorial judgment") (quoting *Chi. Bd. of Trade v. SEC*, 883 F.2d 525 (7th Cir. 1989)), *aff'd*, 512 F.3d 634 (D.C. Cir. 2008).

[33] *United States v, Taylor*, 686 F.3d 182, 197 (3d Cir. 2012) (quoting *Armstrong*, 517 U.S. at 464).

[34] *See, e.g.*, *John B. Busacca III*, Exchange Act Release No. 63312, 2010 WL 5092726, at *13 (Nov. 12, 2010) (quotation marks omitted).

the Commission acted with bad intent. Nor is there any evidence that Myriad was unfairly singled out compared to other, similarly situated microcap issuers. Thus, a selective-prosecution claim cannot succeed.

Construed as an equal-protection claim, Myriad's challenge to the trading suspension still fails. First, an equal-protection claim is not legally cognizable in the context of inherently discretionary governmental decisions. The Supreme Court has held in *Village of Willowbrook v. Olech* that a defendant who is not a member of a protected class may in some contexts nonetheless assert a "class-of-one" equal-protection claim by establishing that it was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."[35] But the Supreme Court has also made clear that *Olech*, which involved a challenge to a land-use decision, does not apply to every kind of government action. There are, the Court explained, "some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."[36] In such contexts, a "'class-of-one' theory of equal protection has no place" because "allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise."[37] Our decision to proceed against one entity but not another—and specifically our decision to suspend trading as to one issuer's securities but take no action with respect to others—is one such discretionary decision.[38]

In any event, even if a class-of-one equal-protection claim were in principle cognizable, Myriad has failed to make the requisite threshold showing that it was "treated differently from others similarly situated."[39] An individual asserting such a claim "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."[40] Myriad asserts that the Commission did not suspend trading in the securities of other, unidentified microcap issuers that allegedly received "toxic" convertible-debt financing or had an operating history suggestive of past involvement in fraudulent stock touts. But this superficial and overly narrow comparison is not enough to establish a viable class-of-one claim, as the Commission's decision to suspend trading in Myriad's securities did not simply turn on these

---

35 528 U.S. 562, 564 (2000).

36 *Engquist v. Oregon Dept. of Ag.*, 553 U.S. 591, 592, 603 (2008).

37 *Id.* at 603.

38 *See, e.g.*, *United States v. Moore*, 543 F. 3d 891, 901 (7th Cir. 2008) (holding that "the discretion conferred on prosecutors in choosing whom and how to prosecute" precludes a class-of-one equal-protection claim in that context); *see also United States v. Green*, 654 F.3d 637, 650 (6th Cir. 2011) (similar; charging decisions).

39 *Olech*, 528 U.S. at 564.

40 *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006); *see also Cordi-Allen v. Conlon*, 494 F.3d 245, 250-51 (1st Cir. 2007) (explaining that the requirement of establishing a "extremely high degree of similarity" includes demonstrating the absence of any "distinguishing or mitigating circumstances as would render the comparison inutile").

generic characteristics. Instead, we looked at all the circumstances before us—including the timing and misleading content of Myriad's press releases and Myriad's inaccurate and incomplete statements touting its Ebola-related business prospects—before arriving at the opinion that a trading suspension was necessary. In short, Myriad does not "identify and relate specific instances where persons situated similarly in *all relevant aspects* were treated differently" from it.[41] Thus its equal-protection claim fails for this reason as well.[42]

*b) Myriad's estoppel argument fails.*

Myriad also contends that the considerations that we identified as supporting the trading suspension existed "prior to the entry of the Suspension Order." Therefore, Myriad asserts that "[t]he Commission very well could have, and by its Rules[] should have, suspended trading in [its] securities." Myriad does not specify the "Rules" it has in mind and we are aware of no provision that would compel us to suspend trading the moment we became aware of conditions that arguably might warrant a suspension.[43] To the contrary, we have discretion as to whether and when we take such action.

It is settled we are not precluded from pursuing a matter simply because we were previously aware of the underlying facts and chose to take no action at the time.[44] More generally, laches, waiver, estoppel, and acquiescence may not be interposed as defenses to the

---

41 *Cordi-Allen*, 494 F.3d at 251 (emphasis added).

42 Because Myriad has not shown that it was treated differently from others similarly situated, it also has failed to establish that "there is no rational basis for the difference in treatment." *See Olech*, 528 U.S. at 564; *cf. Campbell v. Rainbow City*, 434 F.3d 1306, 1314 n.6 (11th Cir. 2006) (requiring plaintiff asserting rational-basis challenge to "negativ[e] every conceivable basis which might support the government action") (quotation marks omitted).

43 Exchange Act Section 12(k) contains no deadline for action or limitation period.

44 *See, e.g.*, *Capital Funds, Inc. v. SEC*, 348 F.2d 582, 588 (8th Cir. 1965) (rejecting argument that the Commission should be estopped from pursuing a matter because the "Commission investigated the . . . situation at that time but took no action"); *William H. Gerhauser*, Sr., Exchange Act Release No. 40639, 1998 WL 767091, at *4 (Nov. 4, 1998) (holding that a regulator's "failure to take early action neither operates as an estoppel against later action nor cures a violation"); *see also* 15 U.S.C. § 78z ("No . . . failure to act by the Commission . . . shall be construed to mean that the [Commission] has in any way passed upon the merits of, or given approval to, any security or any transaction or transactions therein . . . .").

Commission's administration of the securities laws.[45] Accordingly, the propriety of the trading suspension is unaffected by when we acquired knowledge of the circumstances supporting it.[46]

* * *

For all the above reasons, it was and remains our opinion that the public interest and the protection of investors required suspension of trading in Myriad's securities for the full period specified in the Trading Suspension Order.[47]

By the Commission (Chair WHITE and Commissioners AGUILAR, GALLAGHER, STEIN, and PIWOWAR).

Brent J. Fields
Secretary

---

[45] *See, e.g.*, *Graham v. SEC*, 222 F.3d 994, 1008 & n.26 (D.C. Cir. 2000); *Capital Funds*, 348 F.2d at 588; *SEC v. Morgan, Lewis & Bockius*, 209 F.2d 44, 49 (3d Cir. 1953); *Mines & Metals Corp. v. SEC*, 200 F.2d 317, 320-21 (9th Cir. 1953).

[46] Regardless, there is no basis for Myriad's implication that the Commission has unduly dragged its feet. The Trading Suspension Order was issued on November 20, within about a month of Myriad's October press releases, and that interval enabled us to make a considered and deliberate decision to suspend trading. Further, Myriad does not suggest that it was in any way prejudiced by the delay or that the Commission deliberately waited for an improper reason. *See Vernazza v. SEC*, 327 F.3d 851, 864 (9th Cir. 2003); *Panhandle Coop. Ass'n v. EPA*, 771 F.2d 1149, 1153 (8th Cir. 1985).

[47] We have considered all of the parties' contentions. We have rejected or accepted them to the extent that they are inconsistent or in accord with the views expressed in this opinion.

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 75791 / August 28, 2015

ADMINISTRATIVE PROCEEDING
File No. 3-16317

In the Matter of

MYRIAD INTERACTIVE MEDIA, INC.

ORDER DENYING PETITION FOR TERMINATION OF TRADING SUSPENSION

On the basis of the Commission's opinion issued this day, it is

ORDERED that the petition filed by Myriad Interactive Media, Inc. requesting termination of the November 20, 2014 order suspending trading in its securities for a period of 10 days be denied.

By the Commission.

Brent J. Fields
Secretary